**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MARCO KÄLIN, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>EYEPOINT, INC., JAY S. DUKER, GEORGE O. ELSTON, and RAMIRO RIBEIRO,<br><br>Defendants. | **Case No.**<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Marco Kälin ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding EyePoint, Inc. ("EyePoint" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired EyePoint securities between May 27, 2025 and August 14, 2026, both dates inclusive (the "Class Period"), seeking to

recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2. EyePoint develops and commercializes therapeutics to purportedly improve the lives of patients with serious retinal diseases. The Company's pipeline leverages its proprietary bioerodible "Durasert E" technology for sustained intraocular drug delivery.

3. EyePoint's lead product candidate is DURAVYU. During the Class Period, Defendants were evaluating DURAVYU for the treatment of, *inter alia*, wet age-related macular degeneration ("wet AMD") in EyePoint's Phase 3 LUGANO and LUCIA trials. The primary endpoint of both trials was the average change in best corrected visual acuity ("BCVA") at weeks 52 and 56 versus baseline.

4. At all relevant times while the LUGANO and LUCIA trials were ongoing, Defendants touted DURAVYU's purportedly "differentiated profile," as well as its "uniquely suited" mechanism of action ("MOA") and "robust" and "best-in-class" efficacy profile, purportedly demonstrated by data from other studies. Critically, Defendants cited to these other studies to suggest that the results of the LUGANO and LUCIA trials were likely to be favorable, while consistently touting DURAVYU's clinical, regulatory, and commercial prospects for the treatment of wet AMD.

5. Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) DURAVYU was less effective than Defendants had led investors to believe; (ii) accordingly, DURAVYU's clinical,

regulatory, and commercial prospects were overstated; and (iii) as a result, Defendants' public statements were materially false and misleading at all relevant times.

6. The truth began to emerge on August 17, 2026, when EyePoint issued a press release announcing topline results from the LUGANO trial. The press release disclosed, in relevant part, that "the primary endpoint of change from baseline in best corrected visual acuity (BCVA) versus 2 mg aflibercept on-label control ***was not achieved in the full dataset***, confounded by [an] asymmetric cohort."

7. On this news, EyePoint's stock price fell $9.88 per share, or 66.98%, to close at $4.87 per share on August 17, 2026.

8. Although Defendants asserted that the LUGANO trial's failure was the result an "asymmetric cohort" and "due to chance alone", such that investors could expect more positive results in the LUCIA trial, the LUCIA trial ultimately likewise failed to meet its prespecified primary efficacy endpoint, negating this assertion.

9. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

10. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

11. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

12. Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). Per EyePoint's most recent quarterly report on Form 10-Q, as of November 6, 2026, there were 113,782,597 shares of the Company's common stock outstanding. EyePoint's common stock trades on the Nasdaq Global Market ("NASDAQ"). Accordingly, there are presumably hundreds, if not thousands, of investors in EyePoint's securities located in the U.S., some of whom undoubtedly reside in this District.

13. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

14. Plaintiff, as set forth in the attached Certification, purchased or otherwise acquired EyePoint securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

15. Defendant EyePoint is a Delaware corporation with principal executive offices located at 480 Pleasant Street, Watertown, Massachusetts 02472. EyePoint's common stock trades in an efficient market on the NASDAQ under the ticker symbol "EYPT".

16. Defendant Jay S. Duker ("Duker") has served as EyePoint's President and Chief Executive Officer at all relevant times. Defendant Duker also serves on the Company's Board of Directors. During the Class Period, Defendant Duker sold 197,184 shares of the Company's common stock, enriching himself by approximately $2.5 million.

17. Defendant George O. Elston ("Elston") has served as EyePoint's Executive Vice President and Chief Financial Officer at all relevant times. During the Class Period, Defendant

Elston sold 48,841 shares of the Company's common stock, enriching himself by approximately $309,836.

18. Defendant Ramiro Ribeiro ("Ribeiro") has served as EyePoint's Chief Medical Officer at all relevant times. During the Class Period, Defendant Ribeiro sold 63,826 shares of the Company's common stock, enriching himself by approximately $1.06 million.

19. Defendants Duker, Elston, and Ribeiro are collectively referred to herein as the "Individual Defendants".

20. The Individual Defendants possessed the power and authority to control the contents of EyePoint's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of EyePoint's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with EyePoint, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

21. EyePoint and the Individual Defendants are collectively referred to herein as "Defendants".

## SUBSTANTIVE ALLEGATIONS

### Background

22. EyePoint develops and commercializes therapeutics to purportedly improve the lives of patients with serious retinal diseases. The Company's pipeline leverages its proprietary bioerodible "Durasert E" technology for sustained intraocular drug delivery.

23. EyePoint's lead product candidate is DURAVYU. During the Class Period, Defendants were evaluating DURAVYU for the treatment of, *inter alia*, wet AMD in EyePoint's LUGANO and LUCIA trials.

24. The LUGANO and LUCIA trials are both randomized, double-masked, aflibercept controlled, non-inferiority Phase 3 trials assessing the efficacy and safety of DURAVYU in patients with active wet AMD, including treatment naïve and treatment experienced patients. The primary endpoint of both trials was the average change in BCVA at weeks 52 and 56 versus baseline. The LUGANO trial enrolled 432 patients and the LUCIA trial enrolled 475 patients globally who were randomly assigned 1:1 to a 2.7 mg dose of DURAVYU or an on-label aflibercept control.

25. At all relevant times while the LUGANO and LUCIA trials were ongoing, Defendants touted DURAVYU's purportedly "differentiated profile," as well as its "uniquely suited" MOA and "robust" and "best-in-class" efficacy profile, purportedly demonstrated by data from other studies. Critically, Defendants cited to these other studies to suggest that the results of the LUGANO and LUCIA trials were likely to be favorable, while consistently touting DURAVYU's clinical, regulatory, and commercial prospects for the treatment of wet AMD.

**Materially False and Misleading Statements Issued During the Class Period**

26. The Class Period begins on May 27, 2025, when EyePoint issued a press release during pre-market hours announcing that it had completed enrollment in the LUGANO trial. The press release stated, *inter alia*, that the LUGANO trial is "[s]upported by the ***robust*** DAVIO 2 Phase 2 clinical trial in over 160 patients" "***and is strategically designed to enhance the potential for regulatory and commercial success***."[1]

27. The same press release quoted Defendant Duker as stating, in relevant part:

> The rapid enrollment of the Phase 3 LUGANO trial is a testament to the significant patient and physician enthusiasm for our Phase 3 program and ***underscores the*** . . . ***commercial market potential for DURAVYU*** . . . . We are committed to bringing the first sustained-release tyrosine kinase inhibitor (TKI) to market for patients and physicians in need of a new treatment option for wet AMD.

28. On July 29, 2025, EyePoint issued a press release announcing that it had completed enrollment in the LUCIA trial. The press release stated, *inter alia*, that "***LUGANO and LUCIA are supported by the robust*** . . . ***efficacy data from the DAVIO 2 Phase 2 clinical trial***."

29. The same press release quoted Defendant Duker as stating, in relevant part:

> [W]e continue to demonstrate exceptional execution and our deep commitment to the retinal disease community . . . . The industry-leading pace of our clinical program is a testament to the patient and physician enthusiasm for innovative, novel and ***more durable*** wet AMD treatments and ***DURAVYU's compelling and differentiated profile***. As we look ahead to anticipated topline data for LUGANO in mid-2026 and LUCIA to follow, we remain focused on bringing the first sustained-release TKI for wet AMD to market and advancing our mission of delivering transformative treatment options for patients.

30. In addition, the press release quoted Defendant Ribeiro as touting "DURAVYU's ***best-in-class*** profile," and DURAVYU's purported prospects for "wet AMD patients seeking ***more durable*** therapies that reduce the treatment burden."

[1] All emphases herein are added unless otherwise indicated.

31. On August 6, 2025, EyePoint issued a press release reporting its second quarter ("Q2") 2025 financial results and highlighting recent corporate developments. The press release quoted Defendant Duker as stating, *inter alia*:

> The noteworthy physician and patient enthusiasm we have seen for our Phase 3 program across U.S. and international sites—***supported by DURAVYU's robust Phase 2 efficacy*** . . . ***data package*** and our patient-centric, well-understood trial design—has reinforced the clear need and global demand for more durable wet AMD therapies and ***the role that DURAVYU can play in meaningfully extending the wet AMD treatment paradigm***.

32. The press release further quoted Defendant Duker as stating that "we are well-positioned for DURAVYU to be first-to-market among investigational sustained release treatments for wet AMD."

33. Also on August 6, 2025, Defendants hosted a conference call with investors and analysts to discuss EyePoint's Q2 2025 results. During the call, Defendant Duker repeatedly emphasized DURAVYU's purportedly "robust" and "truly compelling" efficacy data generated to date, stating, *inter alia*:

> We completed 4 clinical trials for DURAVYU, including 3 Phase II trials, treating over 190 patients with DURAVYU across multiple retinal indications, establishing a robust and favorable safety profile that is cited by physicians as a key motivator for their eager participation in our pivotal program.
>
> We've generated the most comprehensive data set among current sustained release therapies in development for wet-AMD, ***establishing truly compelling Phase II efficacy data, demonstrating statistically non-inferior visual acuity compared to on-label aflibercept, while reducing treatment burden by over 80%***.
>
> ***Bolstered by this robust efficacy profile***, outstanding safety and a patient-centric pivotal trial design, we completed oversubscribed Phase III enrollment in record time for this indication, with over 800 patients enrolled across the LUGANO and LUCIA trials.

34. Similarly, on the same call, Defendant Duker repeatedly touted DURAVYU's purported ability to change the treatment paradigm for wet AMD, stating, *inter alia*:

> Our lead product candidate, ***DURAVYU, presents a compelling treatment paradigm shift paired with a new mechanism of action*** . . . . ***Backed by durable efficacy of at least 6 months***, and a consistent and favorable safety profile, coupled with unique storage and administration advantages, ***we believe DURAVYU offers a differentiated product profile that is meaningful to physicians and patients and if approved, would facilitate strong competitive positioning in the wet-AMD treatment landscape***.
>
> * * *
>
> Most importantly, through its novel mechanism of action, ***DURAVYU can potentially deliver stable vision and retinal anatomy when dosed every 6 months***, a cadence that should support improved compliance over the long term for wet-AMD patients. ***The clinical data generated to date indicates that DURAVYU has the potential to meaningfully change the wet-AMD treatment paradigm***, and we've designed our Phase III program to validate this through a clinically rigorous but derisked approach.
>
> * * *
>
> The consistently positive feedback from physicians and patients ***continues to strengthen our conviction in DURYVU's differentiated profile and eventual commercial success***.

35. On October 14, 2025, EyePoint issued a press release "announc[ing] the pricing of an underwritten public offering of 11,000,000 shares of its common stock at a public offering price of $12.00 per share and, to certain investors in lieu of common stock, pre-funded warrants to purchase up to an aggregate of 1,500,000 shares of its common stock at a price to the public of $11.999 per each pre-funded warrant" (the "October 2025 Offering"). After deducting underwriting discounts and commissions, and before other estimated offering expenses payable by the Company, EyePoint reaped approximately $141 million in net proceeds from the October 2025 Offering.

36. On November 5, 2025, EyePoint issued a press release reporting its third quarter ("Q3") 2025 results and highlighting recent corporate developments, including "*preclinical data demonstrating DURAVYU's potential as a multi-target treatment inhibiting both VEGF-mediated*

*vascular permeability and IL-6 mediated inflammation, key contributors to wet AMD*[.]" (Emphasis in original.)

37. The press release also quoted Defedant Duker as stating, *inter alia*:

> With topline data from our LUGANO trial expected in mid-2026 and LUCIA to closely follow, we believe ***we are well-positioned for DURAVYU to be first to file and first to market among all investigational sustained release programs in this indication, positioning DURAVYU at the forefront of innovation***.

38. Also on November 5, 2025, Defendants hosted a conference call with investors and analysts to discuss EyePoint's Q3 2025 results. During the call, Defendant Duker repeatedly emphasized new data purportedly supporting the efficacy of DURAVYU's MOA as a treatment for wet AMD, stating, *inter alia*:

> We announced new preclinical data showing that vorolanib, the active drug in DURAVYU, is unique among TKIs being tested in retinal diseases as it inhibits both [ VEGF ]-mediated vascular permeability and interleukin-6 or IL-6 mediated inflammation. ***This multi-mechanism of action has the potential to be particularly effective in the treatment of multifactorial diseases such as wet AMD*** . . . . ***These new data*** . . . ***strengthened our confidence in our clinical programs.***
>
> * * *
>
> We believe our lead product candidate, ***DURAVYU, is well positioned to deliver much needed innovation in*** . . . ***wet AMD*** . . . . As a differentiated sustained-release TKI, ***DURAVYU is designed to improve the current standard of care by providing durable disease control*** while reducing the treatment burden.
>
> Further, ***DURAVYU's potential multi-MOA blocking VEGF, PDGF and IL-6 signaling may be uniquely suited to effectively address multifactorial retinal diseases such as*** . . . ***wet AMD***. Beyond its unique MOA, DURAVYU offers a compelling product profile that supports strong competitive positioning in . . . wet AMD . . . .

39. On January 7, 2026, EyePoint issued a press release reporting a corporate update and anticipated pivotal milestones for 2026. The press release touted, *inter alia*, "DURAVYU's multi-mechanism of action, including inhibition of IL-6 mediated inflammation and VEGF-mediated vascular permeability," which "are both key contributors to wet AMD[.]"

40. In addition, the press release quoted Defendant Duker as stating, in relevant part:

> DURAVYU is ***uniquely poised*** to potentially disrupt the largest retinal disease markets, with a ***unique multi-mechanism of action***, and a ***compelling profile*** within the retinal disease community. We remain focused on advancing DURAVYU as a ***best-in-class and first-in-class*** sustained delivery therapy to improve the lives of patients with serious retinal diseases.

41. On March 4, 2026, EyePoint issued a press release reporting its fourth quarter ("Q4") and full year ("FY") 2025 financial results and highlighting recent corporate developments. The press release quoted Defendant Duker as continuing to tout DURAVYU's clinical, regulatory, and commercial prospects, stating, in relevant part:

> EyePoint enters 2026 from a position of strength as we prepare to deliver on key Phase 3 milestones and showcase the potential of ***DURAVYU's best-in-class*** . . . ***efficacy profile*** . . . . We expect to report Phase 3 topline data in wet AMD beginning in mid-2026, and ***we are confident that our de-risked approach and non-inferiority pathway position us to potentially obtain a broad and favorable label***.
>
> * * *
>
> With . . . ***DURAVYU's clinical and mechanistic differentiation***, and our rapidly approaching Phase 3 readouts, ***we are optimally positioned to continue our leadership in sustained drug delivery*** and address the needs of patients living with serious retinal diseases.

42. The same day, Defendants hosted a conference call with investors and analysts to discuss EyePoint's Q4 and FY 2025 results. During the call, Defendant Duker stated, *inter alia*:

> ***Our conviction in DURAVYU's blockbuster potential is underpinned, first and foremost, by its compelling clinical profile.*** In our Phase II trials in the largest retinal disease markets, ***a single dose of DURAVYU demonstrated durable efficacy with improved vision and tight anatomical control***.
>
> * * *
>
> In addition to its ***robust clinical profile***, we continue to believe that . . . ***a best-in-class delivery technology and a novel multi-MOA that inhibits VEGF, PDGF and IL-6 via the JAK1 receptor with no TIE-2 inhibition are the key drivers of its differentiated profile***. This unique profile positions DURAVYU to address both VEGF-mediated vascular leakage and IL-6 mediated inflammation that contribute

> to disease pathogenesis in wet AMD . . . , ***thereby potentially enabling improved long-term outcomes for patients with fewer injections***.
>
> * * *
>
> ***Based on the success of our large Phase II DAVIO 2 trial and with our proven regulatory pathway and strong execution to date, we believe our wet AMD program is uniquely derisked and optimized to support success.***

43. On March 5, 2026, EyePoint filed an annual report on Form 10-K with the SEC, reporting its financial and operating results for its Q4 and FY ended December 31, 2025 (the "2025 10-K"). The 2025 10-K touted the "new preclinical data identifying vorolanib (the active agent in DURAVYU) as a ***multi-mechanism therapy***" with a "***dual-action profile***" that "***further differentiates DURAVYU from current standard-of-care treatments for wet AMD***[.]"

44. Appended as exhibits to the 2025 10-K were signed certifications pursuant to the Sarbanes-Oxley Act of 2002, wherein Defendants Duker and Elston certified, in relevant part, that the 2025 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report[.]"

45. On May 6, 2026, EyePoint issued a press release reporting its first quarter ("Q1") 2026 financial results and highlighting recent corporate developments. The press release quoted Defendant Duker as stating, in relevant part:

> DURAVYU is well positioned to potentially bring a new multi-mechanism of action sustained delivery treatment option to patients and physicians in these important retinal disease markets. ***DURAVYU's robust clinical profile to date***, combined with our de-risked and patient-centric approach, ***drives our conviction for its best- and first-in-class potential***.

46. The press release also continued to tout the "new preclinical data" that "further highlight DURAVYU's multi-mechanism of action and its potential to bring a synergistic anti-inflammatory effect to the established VEGFR and PDGF inhibition for treatment of wet AMD[.]"

47. Also on May 6, 2026, Defendants hosted a conference call with investors and analysts to discuss EyePoint's Q1 2026 results. During the call, Defendant Duker continued to tout DURAVYU's clinical, regulatory, and commercial prospects, stating, *inter alia*:

> [W]e are confident that our clinically-rigorous, derisked and patient-centric approach will continue to reinforce DURAVYU's best-in-class potential in the 2 largest retinal disease markets. ***The fundamental strength of the DURAVYU program lies in its robust and differentiated clinical data. In Phase II trials, a single dose of DURAVYU demonstrated durable efficacy with improved vision and tight anatomic control.***
>
> * * *
>
> ***[W]e believe the multi-mechanism of action or MOA of DURAVYU's active ingredient, vorolanib, will prove to be a key clinical differentiator.*** Along with blocking all VEGF isoforms and PDGF at the receptor level, ***preclinical data supports vorolanib's ability to inhibit IL-6 signaling via the JAK1 receptor***. With this unique ability to not only address both the vascular leakage and inflammation that contributes to retinal disease pathogenesis, but also potentially provide sustained release efficacy, ***DURAVYU is uniquely designed to deliver wide-reaching therapeutic potential***.
>
> Earlier this week, we presented peer-reviewed data at the Association for Research in Vision and Ophthalmology, or ARVO meeting that ***reinforces these findings and further substantiate DURAVYU's potential to improve long-term outcomes for patients***. A primary kinase screen and subsequent measure of IC50 levels identified vorolanib as a potent inhibitor of JAK1, which plays a critical role in IL-6 mediated inflammation. In addition, vorolanib proved to be a potent inhibitor of IL-6 leakage in an in vitro cellular model. ***This data further highlights the multi-MOA potential of DURAVYU with the opportunity to bring a synergistic anti-inflammatory effect in addition to established VEGF and PDGF inhibition to the treatment of wet AMD*** . . . .

48. Similarly, Defendant Duker stated, in relevant part:

> With a ***unique multi-MOA, robust clinical data package, proven delivery technology***, the ability to be shipped and stored at ambient temperatures and administration via standard in-office intravitreal injection, ***DURAVYU represents a compelling and truly innovative product profile that has the potential to reshape the treatment paradigm for serious retinal diseases***. We continue to make significant strides in our commercial readiness while remaining disciplined in our investments as we prepare for regulatory submission.

49. On August 5, 2026, EyePoint issued a press release announcing its Q2 2026 financial results and highlighting recent corporate developments. The press release quoted Defendant Duker as stating, in relevant part:

> With topline data from our pivotal Phase 3 LUGANO wet AMD trial expected this month, followed by LUCIA in the fourth quarter, . . . we continue to execute across our clinical programs . . . . The LUGANO and LUCIA data readouts ***represent transformative advancement in the wet AMD landscape***, potentially positioning DURAVYU as ***the foundational treatment option for sustained patient care***.

50. The statements referenced in ¶¶ 26-34 and 36-49 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) DURAVYU was less effective than Defendants had led investors to believe; (ii) accordingly, DURAVYU's clinical, regulatory, and commercial prospects were overstated; and (iii) as a result, Defendants' public statements were materially false and misleading at all relevant times.

51. Likewise, Defendants violated Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303(b)(2)(ii) ("Item 303"), which required EyePoint to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." Defendants' failure to disclose that DURAVYU was less effective than they had led investors to believe, and that DURAVYU's clinical, regulatory, and commercial prospects were overstated, violated Item 303 because these issues represented known trends or uncertainties that were likely to have a material unfavorable impact on the Company's business and financial results.

**The Truth Begins to Emerge**

52. The truth began to emerge on August 17, 2026, when EyePoint issued a press release during pre-market hours announcing topline results from the LUGANO trial (the "August 17 Press Release"). The press release disclosed, in relevant part, that "the primary endpoint of change from baseline in best corrected visual acuity (BCVA) versus 2 mg aflibercept on-label control ***was not achieved in the full dataset***, confounded by [an] asymmetric cohort."

53. Also on August 17, 2026, during pre-market hours, Defendants hosted a conference call with investors and analysts to discuss the LUGANO trial's topline results. During the call, Defendant Duker provided additional details regarding the "asymmetric cohort" that had purportedly "confounded" the trial's results, stating, *inter alia*:

> So who are these asymmetric cohorts? Remember, these are elderly patients, and they can lose vision for reasons other than wet Age-related Macular Degeneration. That is to be expected. In the DURAVYU arm, however, ***nine patients lost greater than 15 letters of vision due to non wet AMD etiologies. That included six patients who lost significant vision from geographic atrophy, dry AMD, two patients lost vision from Glaucoma and one lost vision following a retinal detachment***.
>
> Interestingly, all nine showed good anatomic control of their wet AMD, and six of these nine eyes received a supplement at some point in the study, ***but none of the supplementation improved their vision. These nine eyes accounted for a total of 258 total losses of letters***.
>
> Why are we calling this asymmetric? Because in the aflibercept control group, surprisingly, none of these eyes lost more than 15 letters due to a non-wet AMD diagnosis.

54. On the same call, Defendant Duker confirmed that adverse events and, accordingly, DURAVYU's safety profile, was not to blame for these "asymmetric" patient outcomes, stating:

> So this was highly unusual in an elderly population that there weren't additional patients who lost significant vision due to non-wet AMD diagnosis.
>
> So what did our preliminary evaluation conclude about this? So the first question is, ***was this asymmetries in adverse events, is that what resulted in the visual outcome result? And the answer appears to be no.*** Cataracts were evenly balanced

> between the two arms. Intraocular pressure increase evenly balanced. We had very little intraocular inflammation or IOI, only one patient in each group and the IOI was not severe. These are investigator-reported percentages of dry age-related macular degeneration. And you can see while no statistical difference, there was a trend for more dry AMD overall in the aflibercept arm.

55. An analyst on the call asked "what gives you confidence that you won't have a confounding cohort in LUCIA as well?" In response, Defendant Duker attributed the LUGANO trial's results to, essentially, a mere happenstance that was unlikely to repeat in the LUCIA trials, stating:

> Well, I think, again, looking at the data, having eyes in an elderly population that lose vision from geographic atrophy, which is unrelated to wet AMD therapy or other diagnosis is not unusual. Having none of them in the control group is highly unusual. And so again, those type of diagnoses, additional anti-VEGFs don't stop glaucoma. They don't stop the cataract after retinal detachment repair. And so what we would expect is not that these would not occur at all in LUCIA, ***but they would be balanced.***
>
> ***And had they been balanced, then we would have hit the primary.*** Now I didn't show a slide on this, but we've already done an analysis like that, where if we had taken all the 15 letter losers and just split them evenly between the two arms. And did that randomly, and we did that over 10x randomly and each time we were non-inferior. ***So we believe that it's likely that this was due to chance alone and that we won't see a similar split in LUCIA.***

56. The foregoing disclosures prompted a slew of market analyst downgrades and sharp price target ("PT") cuts. For example, Cantor Fitzgerald and J.P. Morgan both cut their recommendation on EyePoint to neutral from overweight, H.C. Wainwright & Co. and Chardan Capital Markets both cut their recommendation to neutral from buy, RBC Capital Markets cut its recommendation to sector perform from outperform and its PT from $37.00 to $5.00 (a decrease of ***86.49%***), Jefferies cut its PT from $30.00 to $8.00 (a decrease of ***73.33%***), and Citigroup cut its PT from $35.00 to $17.00 (a decrease of ***51.43%***).

57. Indeed, the same morning that EyePoint issued the August 17 Press Release, *Bloomberg News* reported that "EyePoint shares [had] s[a]nk as much as ***73%***, ***a record drop***, after

the drug developer said its experimental treatment for an eye disease failed to meet its primary goal in a late-stage trial."

58. Ultimately, following EyePoint's issuance of the August 17 Press Release, the Company's stock price fell $9.88 per share, or ***66.98%***, to close at $4.87 per share on August 17, 2026.

**Post-Class Period Developments**

59. On October 19, 2026, EyePoint announced disappointing topline results from the LUCIA trial, shattering Defendants' narrative that the LUGANO trial's results were mere happenstance. Specifically, Defendants disclosed that the LUCIA trial also ***failed to meet its prespecified primary efficacy endpoint***, and that, in response to this clinical failure, EyePoint was initiating significant cost-cutting measures, ***including the immediate termination of its late-stage wet AMD clinical program and a 53% workforce reduction*** designed to restructure its operations around separate diabetic macular edema programs.

60. Demonstrating investors' loss of faith in Defendants and DURAVYU more generally, following these disclosures, EyePoint's stock price fell $2.55 per share, or ***85.28%***, to close at $0.44 per share on October 19, 2026.

61. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

**SCIENTER ALLEGATIONS**

62. During the Class Period, Defendants had both the motive and opportunity to commit fraud. For example, during the Class Period, while disseminating the materially false and misleading statements alleged herein to maintain artificially inflated prices for EyePoint's

securities, each of the Defendants enriched themselves by selling a significant number of shares of EyePoint common stock. Specifically, during the Class Period, Defendant Duker enriched himself by approximately $2.5 million by selling 197,184 shares of EyePoint common stock, Defendant Ribeiro enriched himself by approximately $1.06 million by selling 63,826 shares of EyePoint common stock, Defendant Elston enriched himself by approximately $309,836 by selling 48,841 shares of EyePoint common stock, and EyePoint, via the October 2025 Offering, enriched itself by $141 million by selling 11,000,000 shares of its common stock, as well as pre-funded warrants to purchase up to an aggregate of 1,500,000 shares of its common stock.

63. Defendants also had actual knowledge of the misleading nature of the statements they made, or acted in reckless disregard of the true information known to them at the time. DURAVYU is EyePoint's lead product candidate, and wet AMD was one of its most, if not the most, lucrative potential indication for this product candidate. Accordingly, the Individual Defendants were undoubtedly laser focused on all aspects of the Company's business related to DURAVYU's potential as a treatment for wet AMD, as exhibited by their highly specific statements regarding DURAVYU for this indication in, *inter alia*, press releases, earnings calls, and the 2025 10-K during the Class Period. As such, the Individual Defendants were presumably aware of the misleading nature of their statements touting DURAVYU's efficacy and that these statements presented a misleading picture regarding DURAVYU's true clinical, regulatory, and commercial prospects. Accordingly, Defendants participated in a scheme to defraud and committed acts, practices, and participated in a course of business that operated as a fraud or deceit on purchasers of the Company's securities during the Class Period.

**PLAINTIFF'S CLASS ACTION ALLEGATIONS**

64. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired EyePoint securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

65. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, EyePoint securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by EyePoint or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

66. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

67. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

68. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of EyePoint;
- whether the Individual Defendants caused EyePoint to issue false and misleading financial statements during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;
- whether the prices of EyePoint securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

69. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

70. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;
- the omissions and misrepresentations were material;
- EyePoint securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;
- the Company traded on the NASDAQ and was covered by multiple analysts;
- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and
- Plaintiff and members of the Class purchased, acquired and/or sold EyePoint securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

71. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

72. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## <u>COUNT I</u>

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

73. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

74. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

75. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under

which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of EyePoint securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire EyePoint securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

76. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for EyePoint securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about EyePoint's finances and business prospects.

77. By virtue of their positions at EyePoint, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

78. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of EyePoint, the Individual Defendants had knowledge of the details of EyePoint's internal affairs.

79. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of EyePoint. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to EyePoint's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of EyePoint securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning EyePoint's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired EyePoint securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

80. During the Class Period, EyePoint securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of EyePoint securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired

said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of EyePoint securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of EyePoint securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

81. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

82. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

**COUNT II**

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

83. Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

84. During the Class Period, the Individual Defendants participated in the operation and management of EyePoint, and conducted and participated, directly and indirectly, in the conduct of EyePoint's business affairs. Because of their senior positions, they knew the adverse non-public information about DURAVYU's true clinical, regulatory, and commercial prospects.

85. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to EyePoint's

financial condition and results of operations, and to correct promptly any public statements issued by EyePoint which had become materially false or misleading.

86. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which EyePoint disseminated in the marketplace during the Class Period concerning EyePoint's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause EyePoint to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of EyePoint within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of EyePoint securities.

87. Each of the Individual Defendants, therefore, acted as a controlling person of EyePoint. By reason of their senior management positions and/or being directors of EyePoint, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, EyePoint to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of EyePoint and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

88. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by EyePoint.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

**DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

Dated: November 17, 2026

Respectfully submitted,

POMERANTZ LLP

*/s/ Jeremy A. Lieberman*
Jeremy A. Lieberman
J. Alexander Hood II
James M. LoPiano
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
ahood@pomlaw.com
jlopiano@pomlaw.com

*Attorneys for Plaintiff*

**CERTIFICATION PURSUANT**
**TO FEDERAL SECURITIES LAWS**

1. I, _Marco Kälin________________________________, make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2. I have reviewed a Complaint against EyePoint, Inc. ("EyePoint") and authorize the filing of a comparable complaint on my behalf.

3. I did not purchase or acquire EyePoint securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4. I am willing to serve as a representative party on behalf of a Class of investors who purchased or otherwise acquired EyePoint securities during the Class Period as specified in the Complaint, including providing testimony at deposition and trial, if necessary. I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5. The attached sheet lists all of my transactions in EyePoint securities during the Class Period as specified in the Complaint.

6. During the three-year period preceding the date on which this Certification is signed, I have not served or sought to serve as a representative party on behalf of a class under the federal securities laws.

7. I agree not to accept any payment for serving as a representative party on behalf of the Class as set forth in the Complaint, beyond my *pro rata* share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

**Executed __07.10.2026____________________**
**(Date)**

______________________________________
**(Signature)**

_______Marco Kälin______________________
**(Type or Print Name)**

**EyePoint, Inc. (EYPT)** **Marco Kälin**

**List of Purchases/Acquisitions and Sales**

| Transaction Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|
| Purchase/Acquisition | 5/7/2026 | 340 | $13.3900 |
| Purchase/Acquisition | 6/9/2026 | 270 | $11.4700 |
| Purchase/Acquisition | 7/28/2026 | 315 | $12.0000 |